IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Emanuel Gerardo Cota-Ruiz, et. al.<br><br>　　　　　Defendants. | No. cr-11-2325-TUC-JGZ (CRP)<br><br>**REPORT AND RECOMMENDATION** |

Pending before the Court is Defendant Ramon Varela-Rojas's Motion to Dismiss for Outrageous Government Conduct. (Docs. 33, 37, 38). Defendant Edgar Roberto Arreola-Guerra joined the Motion and provided supplemental briefing. (Doc. 41, 43). Defendants Emanuel G. Cota-Ruiz and Aureliano Navarro-Amavizca subsequently joined the Motion and the supplemental briefing filed by Defendant Arreola-Guerra; Defendants Cota-Ruiz and Navarro-Amavizca did not file their own supplements. (Docs. 44, 45). The Government contests the Motion. (Doc. 39). No replies were filed.

**Factual Summary[1]**

The Government alleges Defendants conspired to rob a drug stash house. The stash house was fictitious. The alleged crime was a reverse sting conducted by agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The agents originally learned of Defendant Cota-Ruiz from a confidential informant ("CI").

The CI told ATF Special Agent Brandt that Defendant Cota-Ruiz "was looking to make money (no matter the means)." (Doc. 38-1, p. 2). As testified to by the CI in the *in*

---

[1] The Magistrate Judge did not conduct an evidentiary hearing. The facts alleged are taken from investigative reports written by agents of the Bureau of Alcohol, Tobacco, and Firearms and Explosives who were involved in the investigation of Defendants. (Docs. 37-1, 38-2, 38-2). The Magistrate Judge also refers generally to testimony from the confidential informant taken during the *in camera* hearing and filed under seal. (Doc. 68).

*camera* hearing, the ATF agents asked the CI whether the CI knew anyone who might be interested in a stash house robbery and the CI thought of Defendant Cota-Ruiz. (Doc. 68, p. 30). The CI informed Defendant Cota-Ruiz that a friend of a friend was a disgruntled drug courier looking for a home invasion crew to rob a drug stash house. (*Id*.). The alleged disgruntled drug courier was an undercover ATF agent ("Undercover Agent"). Defendant Cota-Ruiz told the CI that he was "very interested in getting more details" about the potential stash house robbery. (*Id*.).

Later, in a meeting between the CI, Defendant Cota-Ruiz, Defendant Arreola-Guerra and Defendant Varela-Rojas, the CI outlined the stash house robbery scenario. (Doc. 38-1, p. 2; Doc. 38-2, pp. 7-8). Defendant Cota-Ruiz immediately asked whether the house contained marijuana or cocaine. (*Id*.). When the CI replied "cocaine," Defendant Cota-Ruiz allegedly said "[f]uck yeah we're interested. There's money in that." (*Id*.). The CI recalled that Defendant Arreola-Guerra indicated that their crew was experienced. (Doc. 38-2, p. 8). The CI also stated that Defendant Varela-Rojas was "running his mouth" at the meeting. (*Id*.). The CI's consistent testimony was that none of the defendants were hesitant about participating in a home invasion.

After the meeting between the CI and Defendants Cota-Ruiz, Arreola-Guerra and Varela-Rojas, the CI introduced these Defendants to Undercover Agent, who was acting as the disgruntled drug courier. At this meeting, Defendant Cota-Ruiz asked Undercover Agent about the details of the stash house. Undercover Agent told Defendants that the house contained 22 to 39 kilograms of cocaine and Undercover Agent, as the drug courier, was given 6 to 7 kilograms. (Doc. 38-1, p. 4). Undercover Agent also told Defendant Cota-Ruiz that serious individuals occupied the stash house to which Defendant Cota-Ruiz responded Defendants would use violence if needed to deal with the occupants and that Defendants knew what they were doing. (Doc. 38-1, p. 4). Undercover Agent also allegedly told Defendants that when he enters the stash house he observes two people and that one of them is armed with a firearm. (Doc. 33, p. 4;

- 2 -

Defendants did not provide the page of the investigative report with this information). Defendant Navarro-Amavizca stated that upon entering the stash house, he would knock down any occupant who did not get on the ground. (Doc. 38-1, p. 6). Defendants also told Undercover Agent that they would move the cocaine to Las Vegas and New York. (*Id*.).

On the day of the planned robbery, Undercover Agent met with all four defendants in a parking lot of a shopping facility. (Doc. 38-2, p. 1). Undercover Agent asked and Defendants confirmed that they were ready. (*Id*.). Defendant Varela-Rojas stated they had "long guns." (*Id*.). Defendant Varela-Rojas also told Undercover Agent that one of the defendants could strike Undercover Agent while he was in the house so the occupants would not suspect Undercover Agent's involvement in the robbery. (Doc. 38-2, p. 2).

**Analysis**

Defendants argue dismissal of the indictment against all four defendants is appropriate because the Government acted outrageously in setting up the reverse sting. Defendants allege ATF agents engineered and directed the stash house robbery from start to finish and Defendants only followed the lead of the agents. Contesting the Motion, the Government argues Defendants were willing participants and put together many aspects of the plan on their own.

The defense of outrageous government conduct is limited to extreme cases in which the government's conduct is "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment." *United States v. Gurolla*, 333 F.3d 944, (9th Cir.2003) (internal quotation and citation omitted). Dismissal of an indictment for government misconduct is appropriate "only where the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir.2007) (internal quotation and citation omitted). "This standard is met when 'the government engineers and directs a criminal enterprise from start to finish,' but is not met 'when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning

- 3 -

to participate in the conspiracy, or provides valuable or necessary items to the venture." *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir.2008) (quoting *Gurolla*, 333 F.3d at 950).

It is not misconduct for the government to facilitate the criminal enterprise. In *Mayer*, a Federal Bureau of Investigation ("FBI") agent set up a fictitious meeting between an adult and an underage boy. *Mayer*, 503 F.3d at 747. After the defendant told the undercover agent that he had previously traveled to have sex with boys, the undercover agent suggested they form a travel group for the purpose of traveling to have sex with boys. The agent suggested a hotel in Mexico that could provide young boys for American tourists, and the agent directed defendant and others to a fake travel website to make their reservations. *Id*. After his arrest, the defendant argued the FBI controlled the criminal enterprise such that it was outrageous conduct and the indictment should be dismissed. The Ninth Circuit disagreed, finding the defendant was a willing participant and that the undercover agent had only facilitated the criminal enterprise. *Id*. at 754.

In the case before this Court, ATF agents asked the CI whether the CI knew anyone who would be interested in robbing a drug stash house. The CI brought Defendant Cota-Ruiz to the attention of ATF agents because Defendant Cota-Ruiz told the CI he "was looking to make money (no matter the means)." (Doc. 38-1, p. 2). The CI then presented Defendant Cota-Ruiz with the fictional scenario in which he and his "crew" could work with a disgruntled drug courier to rob a drug stash house that contained cocaine. Defendant Cota-Ruiz expressed great interest in the robbery because he believed there was money to be made in stealing cocaine. (*Id*.).

Through the course of meeting with the CI and with Undercover Agent, acting as the disgruntled drug courier, Defendants expressed continued interest in robbing the drug stash house and they actively planned the attack. They were made aware of potential dangers including one of the occupants having a gun. Defendant Cota-Ruiz responded that Defendants would use violence if needed to deal with the occupants and also said

- 4 -

that Defendants knew what they were doing. (Doc. 38-1, p. 4). Defendant Navarro-Amavizca stated that upon entering the stash house, he would knock down any occupant who did not get on the ground. (Doc. 38-1, p. 6). Defendants also had a plan to move the cocaine to Las Vegas and New York. (*Id.*). On the day of the planned robbery, Defendant Varela-Rojas told Undercover Agent that Defendants had "long guns." (*Id.*). He also suggested that one of the defendants could strike Undercover Agent while he was in the house so the occupants would not suspect Undercover Agent's involvement in the robbery. (Doc. 38-2, p. 2).

Defendants were not blindly led into this alleged crime. Defendants repeatedly showed that they were willing participants. Defendant Cota-Ruiz expressed, multiple times, his willingness to commit crimes for money when talking to the CI. Defendant Cota-Ruiz's interest in committing crimes is the reason the CI thought of him when ATF agents asked whether the CI knew of anyone interested in a stash house robbery. Defendant Cota-Ruiz told the CI he was definitely interested when he asked and he learned that the stash house contained cocaine. While planning the robbery, Defendants Cota-Ruiz, Arreola-Guerra, and Varela-Rojas all emphasized their experience and ability to successfully commit the robbery as well as their willingness to use violence to complete the crime. On the day planned to commit the robbery, Defendant Navarro-Amavizca also emphasized his comfort with using violence to overcome the occupants.

The ATF agents' conduct in this case was not outrageous and the indictment should not be dismissed. While ATF agents supplied a fictitious scenario in which only two occupants of a drug stash house guarded a large amount of cocaine with one gun, it was Defendants who provided plans for committing the crime and a willingness as well as a gun to engage in any necessary violence to successfully rob the house. Defendants also provided a plan for dividing up the cocaine and for moving their portion of the cocaine out of the state. Government agents did not engineer and direct the criminal enterprise from start to finish.

The Magistrate Judge notes Defendant Varela-Rojas overstates the significance of the five factor test discussed in *United States v. Williams*, 547 F.3d 1187 (9th Cir.2008). *Williams* reiterated a five factor test previously outlined by the Ninth Circuit which, if met, shows the government's conduct was not outrageous and was acceptable. The five factors include:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

*Williams,* 547 F.3d at 1199–2000 (quoting *United States v. Bonnano*, 852 F.2d 434, 437-438 (9th Cir.1988). It is not mandatory that the government satisfy all five of these factors for the court to find the government's conduct was not outrageous. Rather, these factors "appear to function more like a balancing test than a *sine qua non* checklist of absolute requirements for government behavior to be acceptable." *United States v. Simpson*, 2010 WL 1611483, *9 (D.Ariz.2010). As guidelines for analyzing the government's behavior, the factors assist the court in considering the totality of the circumstances in each case. *Id*. at *8.

Considering the totality of the circumstances in the case before this Court, the ATF agents' behavior was acceptable. Defendant Cota-Ruiz communicated to the CI that he was looking to make money committing crimes and also told the CI and Undercover Agent that he and his crew were experienced criminals. When given the opportunity to rob a stash house, Defendant Cota-Ruiz gathered a crew and together Defendants devised a plan. Defendants were engaged in criminal activity in that Defendant Cota-Ruiz was searching for a criminal opportunity and when given one, the other defendants joined and there is no evidence that any of them hesitated. Further, Undercover Agent's participation was not necessary for

- 6 -

Defendants to plan what weapons they would use during the robbery, what violence they would use during the robbery and what they would do with their share of the cocaine once they stole it. As to the final three factors of *Williams*, ATF agents approached the CI inquiring about people potentially interested in robbing a drug stash house. The CI identified Defendant Cota-Ruiz because of statements Defendant Cota-Ruiz previously made to the CI about his desire to commit crimes for money. Defendant Cota-Ruiz then organized a crew, which included the other defendants, and Undercover Agent infiltrated the crew in that he acted as the disgruntled drug courier who had the connection to the stash house. The totality of the circumstances shows ATF agents did not act outrageously. Their behavior was acceptable. Defendants were willing participants who actively participated in the alleged crime.

**Recommendation**

Based on the above, the Magistrate Judge recommends the District Court, after its independent review DENY Defendants' Motion to Dismiss for Outrageous Government Conduct. (Docs. 33). Given the November 20, 2012 trial date, any party may serve and file written objections within **ten days** of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. Any responses to objections must be filed within **five days** of being served with a copy of the objections. **No replies will be permitted**. The parties are advised that any objections filed are to be identified with the following case number: **cr-11-2325-JGZ**.

Dated this 11th day of October, 2012.

*/s/ Charles R. Pyle*

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**